We'll call our last case of this morning, OFI Asset Management et al. v. Cooper Tireand Rubber et al., No. 15-2664, Mr. Herrod and Mr. Ritz. Take the floor, Your Honor. Good morning, Your Honors. May it please the Court. I am James Herrod, Counsel for Appellants, OFI Asset Management, and Timberhill, LLC. With the Court's consent, I would like to reserve four minutes for rebuttal. This case principally concerns defendants' misleading statements and omissions concerning their control over and access to Cooper's Chinese operating subsidiary, known as CCT, Cooper Changshan. We're familiar with the facts in the briefing. You take an exception to the District Court's approach in saying to you, look, I've got this very large complaint with a whole mass of stuff in it. Tell me your top five or so problems, give me your best shot, and let's have a hearing and work through some of this. Your assertion is that that was basically unlawful, but didn't you agree with the Court at the time that that was an appropriate step and that something had to be done to bring some order to this? I don't think so, respectfully, sir. I think that what happened was the judge requested this, and we agreed and obviously made a submission in response to that request in order to help marshal the information that was relevant to the decision on the motion to dismiss. Well, let me actually, I'm looking at page 244, I think it is, of the appendix. Your colleague, I'm assuming Mr. Entwist, responds to a statement by the Court. The Court says it's very difficult for people in my position to sort through all these allegations. So I think that particularly the question of whether a particular statement was false or forward looking, I look at them in isolation saying I can't, you know, analytically it's impossible to say, and they're all there. You look at them and you make assessments and Mr. Entwist says, yes, I agree that even in the sense that you have to organize this in some way, and the Court's inquiry as well as our presentations need to be organized in some way. In other words, I'm trying to find where you said to the District Court, wait a second, this is unfair to us. We have five additional things for you to look at, and you really do need to look at these five additional things. Can you point me to where you said that for the District Court? I'll respond to your question. I don't have a site in the record to the transcript of that. If you look at the letter that we submitted, I think you'll see in the judge, as I remember the hearing, expressed some frustration with us because he said I asked you for five statements and you tried to sneak in all of these other things that related to other statements that weren't included in those five. So there was an initial resistance to this. I also think that it probably for purposes of analysis needs to be bifurcated into two pieces. One is he asked us for five statements, and we provided him with five statements. And some of the statements are repeated and there is a function of time where we believe there are facts which bear upon falsity which build as the class period moves forward. But separating out that for a second, there's also the point of Scianter. And one of the principal errors that we see in the District Court's decision was that he looked at Scianter on a statement by statement basis. Basically took those facts as they were as they related to a specific statement in isolation and didn't consider them holistically as the Supreme Court and this Court and other courts have acknowledged is the proper methodology for analyzing Scianter. Well, didn't he actually, you complain and list on page 29 of your brief the five additional statements you think he should have looked at but didn't. And I looked pretty carefully at what he did. And so, for example, you say the June 12th merger agreement statement that the company maintained internal controls over its financial reporting. He didn't address that. That was wrong. I look at the opinion at A5 and I see that in relation to the warranties in the merger agreement. He attributes to you three arguments with respect to the assertion that the company or one of its subsidiaries had exclusive possession of each owned real property and least real property. And he lists out your arguments including that CCT Cooper had separate financial systems and Cooper could not control or access CCT's system. And then he addresses that third argument you make and says, I don't think that has anything to do with this because the statement is directed at real property. So it looks like he is effectively addressing your question about internal controls. Am I wrong about that? He did say those things and I think that those statements, the facts that you just recited in his mind at least bear upon the question of internal controls. I'm not asking about in his mind. I'm asking about just in fact doing it. You say he didn't address that the company maintained what you alleged to be the false statement that the company maintained internal controls over its financial reporting. He says in relation to the warrantee in the merger agreement, they argue CCT Cooper had separate financial statements. He looks at that argument. He addresses it. He rejects it because he says the statement is directed at real property. So I'm looking at what you say he did address and it sure looks to me like he did address it. I'm asking you to tell me why he's wrong. He's wrong on the possession. I mean, can I address the substantive point? Is that what you're asking for? No, I apologize. I'm trying to address in the first instance the complaint that you put first and center in your briefing, which is we were treated unfairly by the district court. We wanted him to address things and he refused to do it. I look at the very first thing on your list that you say he didn't address and it looks to me like he did address it and I'm trying to get you to respond to that. Okay. Thank you, Your Honor. I'll do my best to try to respond to that. What I understand is he looked explicitly in that portion of the opinion that you're discussing as whether or not Cooper had exclusive possession. And in considering that, he considered whether or not there was control and how that related to the company's internal controls. Specifically, the financial controls reporting that you say he didn't address, right? He didn't. As I read his opinion, he did not address the question of what Cooper's internal controls were as of June 12th. So he should have done more. He should have done more, yes. But I'd really like to address the question of exclusive possession because that's, and it does relate very closely to the question of internal controls, but they are different. And I think one of the things that we look at when you do argue Cooper did not have exclusive possession of CCT on the date of the merger agreement, which I guess was June 12th, because it had been dispossessed from those facilities for some unknown duration at some unknown time in the past. Well, you know, that, how much does that really make a statement incomplete or a 10b-5 violation? I'm lost. Well, I think if you look at all the facts together, it gives you a much better understanding of what happened. But isn't the magic date June 12th? It is June 12th. And we allege that they were dispossessed of access to the facility prior to June 12th. Do you now know roughly when it was before or for how long it was, a day, a week? We do not. And I don't think it's a question of evidence, but if you look at the cases we cite and you look at the standard for this, you have to look at these facts in context. We knew not only that, and allege that they were dispossessed previously of their access to the facility. We also know that the joint venture partner in this transaction, or in CCT, had expressed extreme unhappiness and opposition to the merger. But here's my problem. You're familiar with what recently happened in Oregon, where people took over a portion of federal land that they would not leave. And they were there for weeks. And ultimately, they have left. They're gone. The government now wishes to sell that property. Is the government somehow committing some sort of 10b-5 problem if it said that they now have exclusive possession of that property? I think, because the concept of possession is synonymous, I think, with control. If you look at Black's Law Dictionary, if you look at any other dictionary, it says you can control the asset. The fact that they had a joint venture partner in China who was able to... Can the government sell that property and say that, if they say that they have exclusive possession of this federal property in Oregon that they're now selling, and we know that somebody had been on it for weeks, can the government say correctly that they now, today, have exclusive possession? I don't think so. You don't think so? I don't think so, because they're not in control of the property. Who has exclusive possession besides the government today? I think that if they were engaged in a standoff with the people who had that property, and it took them, I don't remember exactly the period of time, to regain access to it, to regain control of it? Probably close to a month or so. Can they really say, unless they know that that risk is completely eliminated, that those people will not go back and whatever, and it's a very dynamic situation, there's politics and lots of things involved there. But in this situation, what reasonable buyer, and if you're the shareholder and you're looking at this and you're assessing the risks of the merger being consummated, that's what really our case is about. These people bought it and they assumed that the merger was going to go through. That's why the price appreciated when they announced it. Would people really buy it, knowing that the person who's trying to sell Cooper and all of its subsidiaries to Republican... Hold on. Come back to my... I understand. I just... I'm trying to play this out for the next case. Okay. I mean, it could be the government, it could be my house. But the point being that if you have exclusive possession today, and you are representing that you have exclusive possession today, how can that possibly be a violation of securities law? Because that's somebody that has happened to have been on your property and claimed that they were entitled to possession, or they were objecting that you had, you know, for whatever reason. If somebody had dispossessed you of your home, and that person was still involved in running your home, it was your... They're out. They're out now. They're now selling my home. But that's not the situation here. CCT, Changshan was still the partner there. They were there in China. They had control over that facility. What reasonable person would buy your home under that circumstance, when you own a home in China, and you have a caretaker or somebody who owns a part of it, and they have dispossessed you of it previously? Well, it sounds like Apollo would have believed it. Well, I... Apollo may have, but that's not really the question here. The question is, were investors appropriately informed of the risk embedded in this transaction? And we assert, based on all the facts in the record, Changshan had, through their chairman, expressed extreme displeasure. They had... They had... Were motivated to block the transaction, and they were there on the ground in China. When Che assumed control over this facility, Cooper didn't do anything. They knew they couldn't do anything. They didn't go to court in China. They didn't call the government and say, you have to... You have to get us access to our facility. We're trying to sell it to these people. It was a multiple billion dollar transaction. Cooper was, you know, a sophisticated United States entity. They'd been doing business over there for a long time. To say that they could be so readily dispossessed of that property, without being able to take any action... So what you're saying is, because something happened in the past, you don't know when, you don't know how long, that tells you that they could not make a statement that they have exclusive possession on June 12th? I... I think in the context of these particular facts, when the person who's running that facility is telling them he doesn't want them to sell it, and that he want... and he's in the course of engaging with a consortium to try to buy it himself. And the source... and the source of that... of your... your view was the three confidential informants? There was three confidential informants. There is a course of negotiations that led up to... in Cooper's proxy, a disclosed Party C. We talk about that a lot in our papers. And it's clear that Changshan was engaged in a process to potentially acquire Cooper itself. So that's where we get some of the information about motive. We get information from the record on the trial. Prior to the June 12th merger? Correct. And they engaged bankers, they engaged lawyers, they signed a nondisclosure agreement, they conducted due diligence. So all of those things happened. And to your point, your honest point, we also have three former employees of the company who tell us that Cooper had no access to CCT's financial system. It was a closed system. And the only way that they could obtain the financial information from CCT was through the merger agreement? I'm sorry, Your Honor. Before or after the merger agreement? The confidential witness statement? Yeah. That was before the merger agreement. And the district court said the statement that you're complaining about is a statement about real property. Yes. It's not a statement about financial controls and systems. And so it's irrelevant. Right? So looking at the control of real property and based on the one, you know, the assertion at some point in the past somebody had been blocked, the court said under the PSLRA there's a way to evaluate confidential sources. And on page A6 of the opinion, it's page 4 of the slip-off, A6 in the appendix, the court goes through that. Why is it? Was the court out of bounds to say that the PLSRA requires detail provided by confidential sources, basis of knowledge, reliability of sources, corroborative nature of other facts, including other sources, coherence and plausibility, and other indicia of reliability to be assessed? We do think that the court's decision with respect to the confidential witnesses and their statements is incorrect. Why? Okay. Is the standard that I just quoted from the district court the correct standard or the incorrect standard? I think the standard may have been stated correctly, but I don't think it was applied correctly in the sense of if you look at like the Avaya case, I believe is the leading case on this, that you provide the basis for the information, the person's title and their term of employment. It's not one of these cases like there's a case Rockman Brands that cited in the briefing where the people who were being relied upon didn't work at the company at the time the events took place. I mean, these people were there, they had, we alleged the basis, they meet the Avaya test, and I think they're reliable witnesses. But do they meet the institutional investor group versus Avaya test, which is the one I quoted? This is the Avaya test. That's the one I'm quoting and the one the district court was quoting and applied. The court says the witness statements lack detail, sources unknown, no corroboration. I must discount it steeply. If you, where did he misstep in applying that? I think the portion, I can pull the opinion, I don't have it in front of me right now. I think the portion you're talking about is when he talks about the dispossession. He converted that into a confidential witness statement. That wasn't an argument that the defendants even raised. He said that's an admission that, and there's a lot of discussion of this in the briefing, I won't get into it, that's an admission that was in the Delaware Chancery litigation. No, I don't think that's what he's talking about here. I think he's looking at, well, no, it may be right, maybe that's the allegation in a pleading. So you're pointing to something different that you think the court should have been looking at and didn't? It was, I don't know, I don't have an explanation for why the district court converted an allegation that was based on an admission that was in a pleading in Delaware Chancery Court into a confidential witness statement. We clearly think that was error. So we think that there's an admission. This is a pleading motion, and we've cited the cases in our briefs. I don't think we should be required, nor are we required, to plead a level of detail or evidence that only the defendants would have right now. So I can give you the detail that we have in our complaint. We think it's well pled, obviously, but we can't be held to a summary judgment or trial standard at the complaint stage. Okay, we have Mr. Ritz. Thank you very much. Good morning, Your Honors. May it please the court, my name is Jeffrey Ritz. I'm here on behalf of the defendants' appellees. I'm joined today by my colleagues Steve Norman and Marjorie Duffy. If you could start off with the district court dealt with some of the statements that were made. No, Your Honors, there is no cause to remand, and a remand would not be a constructive step here. Because? Starting from first principles here, Your Honor, this court sits to review judgments. So the question here is, did the complaint state an actionable claim under Rule 10b-5, Rule 9b, and the PSLRA, or not? Whether the district court wrote a 40-page opinion instead of a 15-page opinion wouldn't have made any difference. We would be here in exactly the same place today. Are you saying it's immaterial whether a court considers all of the arguments and factual positions that a party has? If the court had said, I'll listen to one argument from you, and otherwise forget it, would you be saying, well, you sit to review judgments, so it doesn't really matter how the district court approached it? That's not exactly what I'm saying. But I am saying, Your Honor, that the review, as we are here today, is a plenary review. This court, of course, can look and see that there are multiple reasons why each and every alleged misstatement in the complaint fails to state an actionable claim. I would also suggest that the district court's manner of proceeding here was entirely reasonable. There was nothing unreasonable about asking the parties to focus on what the plaintiffs themselves thought were the strongest allegations in their complaint, and then to hear over two hours of argument on that. Let me ask you a question that I asked your colleague, Mr. Harrod. I asked, is there someplace where the plaintiffs said to Judge Andrews, hey, we have these five other ones we want you to look at. Here are five other instances of misstatements that we want you to address. Please do so. No, Your Honor. I don't think that was fairly raised. And I think in any event, the district court did adequately address the claims that were raised in the complaint. It went through the top five, and at the end of its decision, it addressed the other omissions that were that the plaintiffs had not pleaded enough to establish an actionable claim under the PSLRA. With respect to the merger agreement, that was, why can't we say that was reasonably relied on by the investors? I mean, that was made public, wasn't it? Your Honor, the defendants did not raise a reliance argument against the allegations based on the merger agreement. The arguments that the defendants raised against the claims directed toward the merger agreement were primarily that the complaint failed to allege facts with particularity to show that any of the reps and warranties in the merger agreement were false when made. That is, that they were false as of June 12, 2013. There are no particularized facts to establish contemporaneous falsity as to any of those. That was the principal argument that the defendants directed toward the claims based on the reps and warranties. Well, okay. In the merger agreement, it appears that there are some disputes. Exclusive possession is one of them. Internal control over financial reporting is another. Yes. Why weren't the allegations sufficient with respect to those? Let's start out with the exclusive possession of real estate. What the alleged misstatement there is, it's a rep and warranty that says Cooper or one of its subsidiaries, which includes CCT, has exclusive possession of each owned or leased real property, which included the CCT plant real estate. The defendant's principal argument was that there were no particularized facts in the complaint to show that that statement was not true as of June 12, 2013. To be sure, there are lots of allegations in the complaint about things that happened later, about later loss of access to that property. Those do not show, however, that there was not possession of real estate on June 12. That's fraud by hindsight. There's no allegation that there was any defect of title on June 12. There's no allegation that somebody adversely possessed the property on June 12. The plaintiffs, really, they put all their chips on an allegation that Apollo made in the Chancery Court, where Apollo alleged that at some time, at some point in the past, there supposedly was an occasion when Cooper was exposed. I thought some of the former employees had indicated that they had lost control physically. No, the confidential witnesses were not the citation, were not the cited support for that allegation. The support for that allegation was an allegation that Apollo made in the Chancery Court litigation with Cooper. That's the only basis. That's the only basis for it. As we pointed out, and as the plaintiffs admitted in the oral argument below, that allegation by Apollo was utterly unparticularized. Even today, the plaintiffs have told us they have no idea when that happened, how long it supposedly lasted, exactly what happened, or who Cooper supposedly even said that to Apollo. That's far too unparticularized. What about the internal control over the financial reporting? The internal controls, again, there were no particularized facts to show that that rep and warranty was false when made on June 12, 2013. The plaintiffs principally point to a much later statement in Cooper's third quarter, 10-Q, about internal control problems that arose when the union interfered with Cooper's access to CCT financial data months later in August. Again, that is just flawed by hindsight. And picking up on that, your proxy says that, quote, neither the strike nor the plant slowdown are expected to have an effect on the consummation of the merger, close quote. The paragraph that appears in the proxy also has a statement that for a period of time there was withheld from you certain business and financial information. And yet when you go down and read neither the strike nor the plant slowdown are expected to have an effect, it doesn't mention anything pertaining to the loss of financial or access to financial data. And if you're reading this as a member of the public, it sounds like everything that went before that in the beginning of the paragraph should be taken into account, which would include the loss of access to financial data. Now, you could argue that, no, we didn't say financial data, it's being queued. But that's the problem. I mean, they're arguing that things were done in such a way that you're trying to give the public, this is going to happen, this is going to happen, and you kept, every day it was becoming more and more clear, this merger was likely not going to happen. Well, your honor, respectfully, that was not the date of the proxy statement, which was August 30th. The alleged misstatement about the CCT strike not being expected to have an effect on the consummation of the merger fails for multiple reasons. The first reason is that that statement is squarely covered by the PSLRA safe harbor. It is expressly forward looking and that's something the plaintiffs have not even contested. Under the disjunctive safe harbor standard then, that statement cannot be a basis for a claim if there were either meaningful cautionary statements or if the plaintiffs have failed to plead actual knowledge of faulty management. Your legal, well, they have asserted, they have asserted that three days before that came out, Mr. Arms got an email in which he was told specifically that, quote, with no control over financial records, there is little chance we can get a financing done given the need for your auditors to sign off, close quote. He was told expressly, we don't have control, we can't get the financial information, there's no way we're going to be able to go to closing. I mean, that's in, allegedly, in Arms' hands three days before the proxy goes out. So, my understanding of your legal position to be that even though this senior it's safe harbor, if you say some cautionary words around it, something that's manifestly false. Your Honor, a couple points. First, it was not manifestly false. Second, in addition to it being covered by the safe harbor, we've got to take, you know, it's true we're here on a 12V6 and the additional PLSRA issues are in the mix, but don't we have to still kind of look at it in the light that allows us to say if they come forward and they've got evidence and they put forth that Arms is on notice before he puts that out, that that's meaningful, that has to be in the mix and determining whether this is a true or false statement? Remember, Your Honor, the complaint expressly admits at several points that Cooper interpreted the merger agreement and particularly the definition of material adverse effect, that provision there, to prevent Apollo from walking away from the deal based on the dislocations at CCT. Okay. The complaint admits that. So, it effectively admits that Cooper genuinely believed at the time of the proxy statement that the MAE carve-out would prevent Apollo from walking away. So, in addition to the safe harbor, that statement is a non-actionable statement of opinion as well. Leave your MAE to the side for a moment. Just ask him the question of whether that's a materially false statement. It sounds to me like you're not disputing that that's materially false. You're saying, you know what, it doesn't matter because we can lie our heads off until the cows come home and if it's forward looking because there's a disjunctive safe harbor, we're good. We're okay. If that's what you think, you're misunderstanding my position, Your Honor. Our point is that, yes, it is covered by the safe harbor, but it was a true statement anyway and is not actionable. That's what I'm trying to get at. Help me with the how is it true? How is it not a problem for your client to have received through a senior officer a statement saying, we can't close this deal because we can't get the financial information and three days later send out a proxy that says neither the strike nor the plan to slow down are expected to have an effect on the consummation of the merger. It's all on the MAE? It's all on the MAC clause? No, not exclusively, but that's a very important part of it, Your Honor. The complaint concedes that Cooper believed that the MAC carve-out prevented Apollo from walking away based on any reaction at CCT to the announcement of the merger. So that covered all of this dislocation. And the complaint never tries to show that it was unreasonable for Cooper to read that provision of the contract the way that it did. And we pointed that out in our appeal brief and the plaintiffs have no response to that at all in their reply brief. There is not a single factual allegation in the whole complaint to substantiate that Cooper was somehow unreasonable in understanding the merger contract. Neither the strike nor the plan to slow down are expected to have an effect on the consummation of the merger. That's pretty broad. That was Cooper's opinion at the time. If they're being told three days in advance you're not going to be able to close, is that not an effect? Even if it's a delay, even if it puts it back, is that not an effect? It may have been that you could read your MAC carve-out to say they can't walk away, but is it not an effect on a merger to have it delayed by weeks or months because you don't have control of financial information? Well, let me suggest, Your Honor, that I think it's an over-reading of the complaint to say that Apollo said before the proxy statement was issued that they would not close. I don't think that's fairly alleged. I also want to point out that this argument about required information, I'm quoting from paragraph 87, where they, as I understand it, there's a statement that ARMS gets an email that says, quote, with no control over the financial records, there's little chance we can get a financing done given the need for your honor's sign-off, unquote. The completion of the quote, the completion of the merger may be jeopardized, unquote. Is that not an allegation? Maybe I misread it. That's not an assertion that Apollo is not going to close, right? Yeah, we're trying to get you to square up with the proxy statement assertion that it will have, quote, that it is not expected to have an effect. Is a failure to close on a closing date not an effect? Well, Your Honor, Cooper understood the merger agreement to provide that Apollo could not walk away over the CCT issue. It may have been the case that they couldn't walk away from it, but does that mean that you honestly believe that you were going to have a closing with no financial data? Your Honor, we don't have the financial data. Let me go after this required information point here. The definition is not even cited in the complaint or in the plaintiff's briefs. Cooper consistently maintained that it provided all of the required information by the end of August. There's no allegation, much less a particularized one, that the defendants did not honestly hold that view. That's not the question. I mean, the question is, no matter, aren't you omitting something significant when you don't have key financial information in believing, in saying that we think this merger is going to go through? No merger is going to really, or at least common sense tells you that most mergers aren't going to go through if you don't have key financial information. Well, Your Honor, what the merger agreement required was that Cooper provided required information in advance of closing so that the debt could be marketed. There is no allegation in the complaint that Cooper did not genuinely think that it had provided all required information by August 30th. Paragraph 109 admits that Cooper and Apollo disagreed about whether required information had been provided, but the complaint never alleges what Cooper's position on required information was or explains why it was wrong. Far left that Cooper was, that it was fraudulent for Cooper to interpret the merger agreement provisions about required information in the way it did. Again, the definition of required information isn't even cited in the complaint. The complaint has never explained what required information was not provided as of August 30th. Cooper had already provided Apollo its second quarter financials and its up-to-date projections. That was all that was required. And that's a segue to why decide this on a motion to dismiss? Why not allow at least additional information to be gathered through discovery and then possibly have this case decided if it can be a motion for summary judgment? First of all, Your Honor, as I pointed out before, your review is plenary here. But second, this case is unusual in the amount of information the plaintiffs had before them when they framed this complaint. They wrote this complaint having the whole Chancery Court trial record in front of them, almost 600 exhibits, a thousand pages of testimony. They are in a place where a normal securities plaintiff would be at summary judgment. And in this light, the many, many gaps and holes in this complaint are especially telling. It would serve no useful purpose for this case to go back for the court to write a longer dismissal opinion or to develop the record that's already there. Thank you very much. I have two other items I'd like you to address. One is the omission of the fact that the Changshan Group made an offer to buy Cooper during the negotiations. And the only reference, of course, was made to Party C. But Party C was not identified. And it seems to me that if they knew it was Che, that might very well be material and significant. And the second is the price reduction that Apollo proffered in September. And why wasn't that material as well? Okay. I'll deal with the Party C issue first, if I may, Your Honor. What the complaint alleges the proxy statement should have said, and this is in paragraphs 107 and 178, is, quote, Party C was Changshan, close quote. No such actionable omission is pleaded here because Cooper could not have truthfully said that. Party C was not Changshan. Party C was a consortium of multiple investors. The plaintiffs don't even challenge the proxy's description of Party C as being a consortium. And the plaintiff's reply brief effectively concedes that it was a consortium. You know, the plaintiffs act like it doesn't matter whether the thing that they should, that they say should have been said even was true or not. But if the thing that they say should have been said wasn't true, that can't be an actionable omission. Also, the underlying reason why they say the function. And Changshan was not a part of the consortium. It was part of the consortium, Your Honor. But the reason that they say the predicate for their saying, well, you should have said Party C was Changshan, they say is that Cooper supposedly rejected a bid by Party C. But that underlying reason isn't adequately pleaded either. Cooper never rejected a Changshan bid. There was never a bid to reject. And the plaintiffs, again, don't contest this in their reply brief. The complaint acknowledges several times that Party C never actually made a bid. Paragraphs 49, 16, 61, and 64 acknowledge that. And they don't challenge the disclosure in the proxy that Party C demurred from making a bid. They said they weren't sure and they needed months more to think about it. So that's not actionable. Let me then turn to the price reduction issue, Your Honor. The plaintiffs make allegations. They tie the price reduction issue to two separate statements. The September 19th 8K, where the results of the United Steelworkers arbitration proceeding were announced. And then the September 30th 8K, where the results of the shareholder vote were announced. Let's take the September 19th 8K first. That allegation doesn't work because there are no particularized facts to show that Apollo had actually demanded a price cut by that date. All that the complaint alleges is that Apollo had hinted or insinuated that that topic could come up later depending on how further negotiations with the Steelworkers Union might go. The complaint doesn't allege that there was actually a price cut request at all until September 25th and 28th. So the claim as to the September 19th 8K doesn't work. As to the September 30th 8K, there was no duty for Cooper to make that statement in that 8K. Notably, that's not even part of the plaintiff's top five, as they took to the district court. They evidently don't think that that's an especially strong claim because there was no affirmative statement in the September 30th 8K that was rendered misleading by that omission. The only statement in that 8K that the complaint challenges is the statement that the merger would be a, that it was a compelling transaction that would create a leader in the global tire industry with a global footprint. The fact that Apollo had asked for a price cut had nothing to do with whether the combined company would be a leader in the tire industry or what its footprint would be. The 8K did not say one single word about the price terms of the deal or any other terms of the deal. Mr. Arms used the word compelling to describe the strategic rationale for the deal, compelling transaction that would create a leader in the tire industry. Again, that doesn't speak to the price or deal terms at all. And Your Honor, in the Pfizer case just a couple years ago, described the word spectacular as being a classic instance of the plaintiffs have not alleged any other basis for a duty to disclose in the September 30th 8K about the request for the price cut. And so any other basis for a duty is waived at this point. And as we explained in the brief, there was no other basis for a duty to disclose the price price cut request. In fact, the plaintiff's argument is contrary to the instructions to Form 8K. Thank you very much. Thank you, Your Honor. Mr. Herrod. As you're coming up, Mr. Herrod, how do you, how do you respond to the, this case is very different from what you normally see. You have a court of chancery proceeding that as court of chancery proceedings go is done quickly, but thoroughly. And you, so you have a lot more to say than what the plaintiffs have. So what's, what's so wrong with deciding this at the 12B6 stage? Well, there's, as a general rule, I don't think that there's anything specifically wrong with it, except that the way this one came out was, was in error. What I would say to you about the chancery litigation is, and if you read those opinions, what you'll see is that Vice Chancellor Glasscock was looking at a very specific, on different occasions, he was looking at very facts that the defendants have relied upon. He's looking very specifically at what the facts were as of October 14th, and whether or not Cooper could have required Apollo to close as of that date. He's not looking at what the defendant arms know on June 12th. What was his understanding of their ability to, to really control. Nothing in the chancery court litigation, no statement, no anything, no innuendo that there were misstatements or omissions that misled people in the merger agreement, the proxy statement, et cetera. I mean, there are facts that obviously bear on those questions. And as, as my opponent has pointed out, you know, we cite some of them, but I don't think that the chancery court decision is at all dispositive to those questions that there are in this case about disclosure under the securities laws. And when I listened to him talk, and when we go through this process, what I hear is a significant and consistent drumbeat of form over substance. We don't have to disclose that party C is Changshan because they didn't really make a bid because it wasn't really just Changshan. It was a consortium that included Changshan. Well, when you say a form over substance, isn't the very fact that Congress demands great particularity through the PLSRA, a matter of not your opponent elevating form, but Congress saying a litigation of this sort is problematic. It's easy to, after the fact, go through and comb thousands of pages and say, you should have said that better and haul people into court. And we don't want that to happen anymore. So if you want to do it, you better have come in with some pretty good guns. That's, that's the congressional read on this. Why shouldn't they be taken advantage of the guns Congress gave them? They absolutely should. And I think that they have, but I think we need to standard in this case. And what I mean by that is... Let me ask you something specific because I pressed, I pressed Mr. Ritz on this pretty hard. This email that Mr. Armscott said, we don't think you're going to be able to close. That comes from Apollo side, right? Correct. Okay. So is Cooper obligated to take a counterparty's assertions, particularly a counterparty that doesn't want to close and is starting to try to renegotiate price as gospel and have that change the way they present information to the public? Or are they entitled to say, look, we think we're fine. We think we're going to be able to close. The August 27 email from, from, I think it's Mr. Conwar at Apollo is one data point in that analysis, but there were two prior ones. One is from Cooper's own Asian CFO. He says, we can't get the data out of CCT. That's from a Cooper person telling the CFO and one of the individual defendants in this case that they can't get the data out of CCT. There was a subsequent discussion about the auditors. They needed to get a comfort letter. And despite Mr. Ritz's characterization of the complaint and this idea about the mayor, the Mac clause, the required information is discussed in our complaint, paragraph 55. Um, and it required them, it required Cooper to provide timely financial information, including an auditor's comfort letter. And we have a footnote in our complaint describing what a comfort letter is saying that they needed to do it. If they didn't do it, they couldn't be, they couldn't require Apollo to perform. And that's ultimately what Vice Chancellor Klaskoff concluded. He said, we can't force them to perform because they were never able to get the financial statements, which were required to have Apollo market the debt out of China. So you have to allege something that raises quote, a strong inference that not only Cooper or Arms or Hughes, uh, believe that the statement regarding the likelihood that the uh, problems with the financial stuff that, that they, that they actively intended to mislead, right? Is that your standard? I think, I mean, isn't that the scienter standard? The scienter standard is recklessness or intent under, with respect to this particular statement that we're talking about and, and, and Hughes, I would say we have knowledge and that vitiates any reliance on the safe harbor. You can't meaningfully say something that's not true, even if it's even, and we do take issue in our reply brief that this is not subject to the safe harbor. But even if you were to concede that it is, it's, it's, he, he's told by people within his own organization that they can't perform under the required information clause of the merger agreement, which is a precondition to closing. He's also like, there's no, what meaningful risk could there have been? Well, they talk about risk disclosures and that's the second prong of the safe harbor. What meaningful risk disclosure could they have made about a risk that had already happened? They already couldn't get the information out of China. How are they going to perform the required information as of that date? I take their position to be that, uh, they, they believe that they were going to be able to close, uh, and because in fact, their counterparty had no legal right to walk away. Maybe there was going to be a delay. Maybe there wasn't going to be a delay. That's something that was, uh, uh, up in the air. You had, you had problems and they were ongoing problems, but, uh, they thought we can get it done. We can get it done. And in fact, there's this back protection in place. They can't walk away. Given that, given the intent to deceive standard, you've got to reach. If, why is that wrong? I think you see in their own disclosure, the reason why is because they knew that they had a legal strategy in mind. They wanted to get a shareholder approval. That was one of the other preconditions to closing shareholder approval. They'd start disclosing the stuff to the shareholders. The people who bought the stock, the arms who were in the stock would have walked away in the shareholders would not have approved the deal because they would have perceived there was huge risk that they had risked on the reverse merger termination fee and other things. So why would they have done that? And if they believe that the May clause protected them 100%, what is the downside of disclosing that information? There will be none. So on those points, I think, you know, I don't understand really the contrary argument or the argument about Scienter. Well, isn't the contrary argument that the PSRA requires us to indulge the contrary presumptions? You've argued presumptions that could be made or conclusions that could be drawn from the evidence. But in the peculiar circumstances of the PSLRA, we're required to look at plausible competing presumptions, right? Yeah, but first of all, that only applies to Scienter, not to Paul Sitter. And here, I don't understand what the competing presumption, the competing inference would be to be drawn from the CFO receiving two messages from people within his own organization that they couldn't do something they needed to do to close a deal and then say, we don't expect it to have any effect on the consummation of the merger. That to me is, they also, you know, if you look back, there's a course of this. There's a strike and a second strike. They publish a 10-Q on August 9th. They say that they didn't have a duty to update, but they disclosed a strike on July 13th in that 10-Q. You know what they didn't disclose? The strike that occurred during the quarter. They didn't disclose the strike that started on June 21st in that 10-Q, which clearly, when they were, had armed guards barring them from that facility, not allowing them to get in, but they said that they had adequate internal controls. And he described the labor stoppages temporary and organized by the union when Che told defendant arms that he was behind it and that it would continue until the merger was ended. Your Honor, I appreciate your indulgence. Thank you very much. Thank you to both counsel for well-precedented arguments. We'll take the matter under advisement and recess.